IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Felicia S.,[1] | ) | C/A No.: 1:20-3965-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Kilolo Kijakazi,[2] Acting | ) | RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On September 22, 2017, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on February 20, 2013. Tr. at 314, 316, 412–18, 419–28. Her applications were denied initially and upon reconsideration. Tr. at 318–21, 322–25, 330–33, 334–37. On October 16, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Randall Huggins. Tr. at 94–129 (Hr'g Tr.). She appeared by telephone for a supplemental hearing on March 25, 2020, after the ALJ referred her for a consultative exam. Tr. at 59–81 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 10, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 34–58. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 13, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 44 years old at the time of the hearings. Tr. at 104. She completed high school and some college. *Id.* Her past relevant work ("PRW") was as a hand packager and a material handler. Tr. at 103. She alleges she has been unable to work since June 7, 2017.[3] Tr. at 127.

2.    Medical History

On October 15, 2016, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine showed a small right lateral disc protrusion at L2–3 and a small left-sided disc protrusion at L4–5. Tr. at 766–67

On January 31, 2017, Plaintiff underwent electromyography ("EMG") and nerve conduction velocity ("NCV") testing that showed no evidence of neuropathy or radiculopathy affecting the right hand. Tr. at 892–94. Tooba Khan, M.D. ("Dr. Khan"), noted Plaintiff's clinical symptoms seemed to be coming from joint pathology and recommended she be assessed for rheumatoid arthritis ("RA"). Tr. at 893.

On February 15, 2017, arterial studies of Plaintiff's lower extremities showed no hemodynamically-significant stenoses in the right lower extremity

---

[3] Plaintiff amended her alleged onset date to the day after the ALJ's prior unfavorable decision. Tr. at 127, 557.

arterial system and normal perfusion of the right and left lower extremities. Tr. at 762–63.

Plaintiff underwent polysomnogram on February 23, 2017, that produced results consistent with obstructive sleep apnea ("OSA"). Tr. at 150.

On June 1, 2017, a renal artery study showed no evidence of occlusive disease in either renal artery. Tr. at 878. A transthoracic echocardiogram ("echo") indicated evidence of grade II diastolic dysfunction, but mostly normal structural findings. Tr. at 879.

On June 6, 2017, a nuclear stress test showed abnormal myocardial perfusion imaging with a moderate area of attenuation in the mid anterior wall that might represent an area of ischemia versus breast attenuation artifact. Tr. at 877. It indicated normal left ventricular function with estimated left ventricular ejection fraction ("LVEF") of 75%. *Id.*

On June 21, 2017, Plaintiff complained of persistent chest pain and diminished exertional capacity, despite her compliance with medications. Tr. at 713. Cardiologist Stacy Graham, M.D. ("Dr. Graham"), noted Plaintiff's stress test was inconclusive, as her left ventricular function was normal, but she had an anterior wall defect. Tr. at 716. She assessed essential hypertension and recommended left heart catheterization. *Id.*

On July 10, 2017, coronary angiography, left heart catheterization, and left ventriculography revealed normal left ventricular function and estimated

4

LVEF of 70%. Tr. at 704–05. Dr. Graham noted Plaintiff's chest pain appeared to be noncardiac in origin. Tr. at 705.

On July 12, 2017, Plaintiff presented to Shervon Pierre, M.D. ("Dr. Pierre"), to establish treatment. Tr. at 816–18. She complained of blurred vision and hypertension exacerbated by stress. Tr. at 816. She endorsed chest pain, fatigue, headache, irregular heartbeat/palpitations, nausea, tinnitus, visual disturbances, vomiting, and swelling. *Id.* She described twice-monthly episodes of ringing in the ears, swaying sensation, dizziness, blurred vision, tunnel vision, headache, sensitivity to light and sound, nausea, elevated blood pressure, swelling, and copper-like smell. *Id.* Dr. Pierre assessed migraine with aura, primary essential hypertension, low vision, and allergic rhinitis. Tr. at 817. She prescribed Imitrex, Cetirizine, and Fluticasone, ordered lab studies, and referred Plaintiff to a neurologist and an ophthalmologist. Tr. at 817–18.

Plaintiff complained of headaches, back pain, and continued chest pressure on July 19, 2017. Tr. at 709. Dr. Graham indicated the chest pressure was likely related to poor blood pressure control and that Plaintiff's blood pressure remained nowhere near goal. *Id.* She assessed New York Heart Association ("NYHA") class II congestive heart failure with diastolic dysfunction and hypertension. *Id.* Plaintiff's blood pressure was 186/120 mmHg. Tr. at 711. Dr. Graham noted Plaintiff's hypertension was

suboptimally-controlled on medical therapy and increased Hydralazine from 25 mg to 50 mg twice a day. Tr. at 712.

On August 1, 2017, Plaintiff complained of intermittent episodes of loss of vision that occurred up to twice a month and typically lasted for 15 to 20 minutes. Tr. at 719. She reported her eyes felt strained and dry at times. *Id.* Nima Mazhari, O.D. ("Dr. Mazhari"), assessed ocular migraines per history, bilateral hypertensive retinopathy, bilateral congenital cataracts, dry eye syndrome of bilateral lacrimal glands, and regular astigmatism of the bilateral eyes. Tr. at 721. He recommended blood pressure monitoring and control. *Id.*

Plaintiff followed up with Dr. Pierre on August 14, 2017. Tr. at 812. She denied migraine relief from Imitrex and indicated Dr. Mazhari felt that her uncontrolled hypertension was possibly causing ophthalmic migraines and affecting the blood vessels in her eyes. *Id.* Plaintiff's blood pressure was elevated at 156/80 mmHg on a first check and decreased to 138/82 mmHg on a second check. Tr. at 813. She endorsed fatigue, phonophobia, blurred vision, photophobia, nausea, and neck stiffness. *Id.* Dr. Pierre increased Imitrex to 50 mg, instructed Plaintiff to take an additional Hydralazine if her blood pressure was elevated during a migraine, and advised her to keep her scheduled appointment with the neurologist. Tr. at 814.

Plaintiff followed up with Dr. Khan for evaluation of migraines on August 24, 2017. Tr. at 924. She reported her headaches had initially responded well to Topamax, but then returned. Tr. at 925. She described two to three severe headaches per month lasting two to three days and associated with blurred vision, numbness, and tingling jaw pain. *Id.* She also endorsed severe joint pain. Tr. at 926. Dr. Khan continued Plaintiff on Topamax 100 mg twice a day, advised her to make changes to diet and exercise, instructed her to limit use of Imitrex to once a week, prescribed Fiorinal for her to use on a limited basis, and referred her to a rheumatologist for further evaluation. *Id.*

On August 29, 2017, Plaintiff presented to the emergency room ("ER") at Chester Regional Medical Center ("CRMC") with right-sided facial pain. Tr. at 726. Richard Arriviello, M.D., diagnosed Plaintiff with hypertension and migraine without aura. Tr. at 730. He prescribed Butalbital-Acetaminophen 50-325 mg and Clonidine 0.2 mg and instructed Plaintiff to stop taking Labetalol and to follow up with her primary care physician ("PCP"). Tr. at 735.

Plaintiff complained of worsened hypertension on September 15, 2017. Tr. at 808. She indicated it was associated with fatigue, irregular heartbeat/palpitations, nausea, visual disturbance, and vomiting. *Id.* She also reported intermittent heart fluttering, mild headache, tingling in the fingers

of her right hand, flashing lights, black dots, facial numbness, and confusion. *Id.* Dr. Pierre observed 1+ pitting edema in Plaintiff's lower legs. Tr. at 810. She performed an electrocardiogram ("EKG") that produced borderline results. Tr. at 810. She assessed hypertensive urgency, administered Clonidine 0.2 mg and aspirin 325 mg and arranged for Plaintiff to be transported to the hospital, as her blood pressure was at stroke level. *Id.*

Plaintiff was hospitalized at CRMC from September 15 to September 16, 2017, for medication adjustment and hypertension stabilization. Tr. at 774. She was discharged with prescriptions for Labetalol 200 mg twice a day and Hydralazine 25 mg three times a day. *Id.*

On September 29, 2017, Plaintiff complained of persistent, worsening lower back pain that radiated to her bilateral thighs and legs. Tr. at 804. Dr. Pierre noted muscle spasm in the thoracic spine and tenderness in the lumbar spine and bilateral knees. Tr. at 805. She administered Toradol and Decadron injections, prescribed Gabapentin 100 mg, and ordered testing for lupus and RA. Tr. at 806.

On October 4, 2017, Dr. Pierre informed Plaintiff that her lab tests were positive for RA. Tr. at 517.

On October 10, 2017, Plaintiff presented to the ER at CRMC with chest wall pain and high blood pressure. Tr. at 1286. Isom Lowman, M.D.,

discharged Plaintiff in stable condition with diagnoses of atypical chest pain, migraine, and essential hypertension. *Id.*

On October 11, 2017, Plaintiff reported some improvement with Imitrex, noting her daily headaches were less intense, but she had experienced two severe headaches over the prior two weeks. Tr. at 922. She declined Dr. Khan's offer to further increase her Topamax dosage. *Id.* Dr. Khan recorded normal findings on physical exam. Tr. at 923. He added Riboflavin and Zanaflex, continued Topamax 100 mg twice daily, and provided Plaintiff information on Botox injections. *Id.*

Plaintiff presented to Aiken McDowell McNair, PA-C ("PA McNair"), for evaluation of polyarthralgia on November 30, 2017. Tr. at 969. She complained of frequent flares of joint pain in her knees, hips, neck, back, toes, and hands and reported she could not walk for more than 30 to 45 minutes without needing to sit due to her knees giving out. Tr. at 970. She reported gaining over 50 pounds since her joint symptoms began. *Id.* She indicated her right hand would swell if she typed, wrote, or braided hair. *Id.* She described morning stiffness in her back, neck, and hands that lasted for 30 to 45 minutes, as well as spasms throughout her body. *Id.* Plaintiff's blood pressure was elevated at 181/137 mmHg. Tr. at 971. PA McNair noted tenderness to palpation ("TTP") of many joints, including those in the hands, wrists, and knees, without synovitis. *Id.* X-rays of Plaintiff's hands showed subtle lucency

at the radial base of the second proximal phalanx and x-rays of her feet indicated minimal bilateral midfoot degenerative changes. Tr. at 972. X-rays of Plaintiff's knees showed early degenerative changes involving the bilateral medial tibiofemoral and patellofemoral compartments. *Id.* PA McNair ordered tests for antinuclear antibody ("ANA"), rheumatoid factor ("RF"), cyclic citrullinated peptide ("CCP"), and markers of inflammation. *Id.*

On November 30, 2017, state agency medical consultant Larry Meade, D.O. ("Dr. Meade"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally push and/or pull with the right upper extremity; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; frequently balance; never climb ladders, ropes, or scaffolds; frequently handle, finger, and reach in front, laterally, and overhead with the right upper extremity; and avoid concentrated exposure to hazards, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. Tr. at 250–52, 262–64.

Plaintiff presented to Lisa Nanovic, D.O. ("Dr. Nanovic"), for evaluation of uncontrolled hypertension on December 20, 2017. Tr. at 959. She reported taking her blood pressure medication as prescribed and checking her blood

pressure regularly. *Id.* She noted her blood pressure would become markedly elevated prior to her next scheduled dose of medication. *Id.* She endorsed average blood pressure readings of 199/114 mmHg in the morning, 176/99 mmHg in the afternoon, and 180/104 mmHg in the evening. *Id.* She indicated she also frequently experienced headaches, chest pain, facial numbness, and vision changes that differed from those associated with migraines. *Id.* Plaintiff weighed 243 pounds and her blood pressure was 176/120 mmHg on exam. Tr. at 960. Dr. Nanovic noted swelling along Plaintiff's bilateral wrists. *Id.* She indicated Plaintiff was on a five-drug regimen for hypertension, but was not yet on maximum doses. Tr. at 961. She stated Plaintiff's report of elevated blood pressure prior to her next doses was concerning for increased hepatic metabolism of hypertensives. *Id.* She stopped Hydralazine and prescribed Verapamil ER 240 mg daily. *Id.* She instructed Plaintiff to call to report her blood pressure readings daily over the next week. *Id.* She explained that Plaintiff might need to increase her dosing regimen. *Id.* She instructed Plaintiff to follow a low-salt diet and to drink caffeine-free beverages. *Id.* She noted Plaintiff's laboratory studies did not suggest renal damage or renal etiology for her hypertension. *Id.*

Plaintiff complained of pain in her right knee and shoulder and bilateral elbows on December 29, 2017. Tr. at 966. She indicated she was unable to straighten her right elbow and was experiencing morning stiffness

lasting at least 30 minutes, eye cramping, and swelling in her hands, wrists, knees, and feet. *Id.* PA McNair noted lab studies revealed Plaintiff to be RF- and CCP-antibody positive, but that hand and foot films showed no erosive disease. *Id.* Plaintiff's blood pressure was elevated at 161/104 mmHg. Tr. at 968. PA McNair noted TTP of the right fifth metacarpophalangeal ("MCP") joint, right third proximal interphalangeal ("PIP") joint, right elbow, left fourth MCP joint, and bilateral wrists. *Id.* He assessed newly-diagnosed seropositive RA, discussed treatment with Methotrexate, and prescribed Methotrexate 10 mg weekly and folic acid daily. Tr. at 969. PA McNair thought Plaintiff's eye symptoms sounded like scleritis and did not relate the cramping sensation in her eyes to RA. *Id.*

On January 22, 2018, Plaintiff reported over the prior two-month period, she had experienced three severe headaches lasting for a couple of days. Tr. at 1035. She desired to proceed with Botox injections, which Dr. Khan agreed to schedule. Tr. at 1035–36.

Plaintiff followed up with Dr. Graham on January 31, 2018. Tr. at 1012. She reported noncardiac chest pain, compliance with her medication regimen, and stable blood pressure. *Id.* Her blood pressure was 114/76 mmHg. Tr. at 1016. Dr. Graham assessed primary essential hypertension and chronic diastolic heart failure. *Id.* She indicated Plaintiff's blood pressure was as good as she had seen it and targeted systolic blood pressure below 130

and diastolic blood pressure below 80. *Id.* She noted Plaintiff had mild exertional symptoms of diastolic congestive heart failure. *Id.* She recommended exercise. Tr. at 1017.

On February 9, 2018, Plaintiff underwent a mammogram that revealed a mass in her right breast that was highly suggestive of malignancy, an additional smaller mass that was consistent with a possible satellite nodule, an abnormal lymph node in the right axilla, and a suspicious left breast mass. Tr. at 1172–73.

On February 23, 2018, Plaintiff presented to nurse practitioner Wayne Wilkens ("NP Wilkens") at Ear, Nose, Throat & Audiology Associates for evaluation of chronic pain behind her left ear, vertigo, tinnitus, pressure, and muffled hearing on the left. Tr. at 1022. She indicated she experienced dizziness three to four times a day. *Id.* She complained of sleeping problems with some improvement with use of continuous positive airway pressure ("CPAP"), but continued fatigue and occasional episodes of apnea. *Id.* Her blood pressure was elevated at 192/126 mmHg. *Id.* Audiogram and tympanogram showed normal hearing bilaterally. Tr. at 1023. NP Wilkens indicated he would initiate a workup to determine the cause of Plaintiff's dizziness. *Id.* He noted eustachian tube dysfunction and sinusitis, prescribed nasal steroids and an antibiotic, and recommended Plaintiff take vitamin B-6. Tr. at 1023–24.

Dr. Khan administered a Botox injection for treatment of Plaintiff's migraines on February 28, 2018. Tr. at 1031–33.

Plaintiff underwent a biopsy on March 5, 2018, that revealed invasive ductal carcinoma in the right breast at the 12:00 location. Tr. at 1169–71.

Plaintiff complained of constant musculoskeletal pain in her back, hips, hands, and feet on March 15, 2018. Tr. at 1110. She indicated Methotrexate was not helping her back pain. *Id.* Her blood pressure was elevated at 160/110 mmHg on a first check and 156/92 mmHg on a second check. Tr. at 1111. She endorsed fatigue, joint tenderness, little interest or pleasure in doing things, and feeling down, depressed, or hopeless. *Id.* Dr. Pierre noted tenderness in Plaintiff's lumbar spine. *Id.* She prescribed one Valium 5 mg tablet for Plaintiff to take 30 minutes prior to undergoing an MRI of her breast. Tr. at 1112. She increased Gabapentin to 300 mg every 12 hours and Methotrexate to six 2.5 mg tablets once a week, counseled Plaintiff regarding diet, and encouraged her to exercise. Tr. at 1112–13.

Plaintiff presented to Britt Blackwell, O.D. ("Dr. Blackwell"), for an eye exam on March 19, 2018. Tr. at 1043–45. She endorsed headaches and blurred vision at a distance. Tr. at 1043. Dr. Blackwell assessed bilateral dry eye syndrome, latent hyperopia, astigmatism, and presbyopia. Tr. at 1045. He prescribed TheraTears for treatment of dry eye syndrome and advised Plaintiff to follow up in a year. *Id.*

14

On March 29, 2018, Plaintiff complained of occasional shooting pain into her groin, increased hip pain with walking and prolonged sitting, stiffness in her back and hips in the morning and evening, morning stiffness lasting 30 to 45 minutes, muscle spasms in her back, and swelling in her hands. Tr. at 1047. She indicated Methotrexate seemed to have helped some of her joints. *Id.* PA McNair noted pain with right log roll, flexion of the hip, and internal and external rotation. Tr. at 1049. He indicated Plaintiff had recently been diagnosed with breast cancer and planned to discuss use of Methotrexate with the oncologist. Tr. at 1050. He stated Plaintiff's lower spine was not affected by RA and that her pain could be due to her hips or a separate issue, as she was experiencing muscle spasms. *Id.*

On March 31, 2018, an MRI of Plaintiff's breasts showed a 3.5 cm invasive carcinoma in the right 12:00 location, prominent bilateral symmetric lymph nodes with previous benign biopsy of the right axilla, indeterminate enhancing nodule in the central right breast in the 9:00 position, and a focal non-mass enhancement in the left lower inner quadrant that was previously biopsied with benign results. Tr. at 1167.

Plaintiff presented to surgical oncologist Shirley Scott, M.D. ("Dr. Scott"), for evaluation of the right breast mass on April 6, 2018. Tr. at 1077. Dr. Scott noted examination of Plaintiff's right breast was significant for a 4 x 4 cm mobile mass at the 12:00 location with no skin changes, no nipple

discharge, and no palpable right axillary lymphadenopathy. Tr. at 1079. Given estrogen-receptor/progesterone-receptor ("ER/PR") negative and human epidermal growth factor receptor 2 ("HER-2") positive status of Plaintiff's right breast cancer, Dr. Scott recommended neoadjuvant chemotherapy prior to surgery. *Id.* She discussed surgical options that included lumpectomy and sentinel node biopsy followed by radiation therapy, as well as mastectomy and sentinel node biopsy with or without reconstruction. *Id.* She ordered an EKG, lab studies, and additional imaging studies and referred Plaintiff for genetic counseling and to medical oncology to discuss neoadjuvant chemotherapy. Tr. at 1080. She noted Plaintiff's blood pressure was extremely elevated and that she had attempted to contact her primary care provider. *Id.*

On April 10, 2018, a bone scan showed no abnormal uptake to indicate osseous metastases. Tr. at 1108.

Plaintiff reported stable cardiac symptoms on April 12, 2018. Tr. at 1532. An EKG showed normal sinus rhythm and heart rate of 92 beats per minute ("BPM"). Tr. at 1537. Dr. Graham continued Plaintiff's treatment for hypertension and indicated there was no contraindication to chemotherapy. *Id.* She encouraged Plaintiff to exercise and lose weight. *Id.*

On April 13, 2018, a computed tomography ("CT") scan of Plaintiff's chest revealed primary right breast neoplasm, small nonspecific right

axillary nodes, and a 4 mm left lower lobe subpleural nodule. Tr. at 1103–04.

A CT scan of Plaintiff's abdomen and pelvis showed no evidence of

abdominopelvic metastasis. Tr. at 1105.

Plaintiff presented to medical oncologist Alaa Muslimani, M.D. ("Dr.

Muslimani"), for a consultation on April 16, 2018. Tr. at 1095. She

complained of diffuse muscle, joint, and hip pain, shortness of breath on

exertion, chest pain with deep breaths, nausea, vomiting, loss of appetite,

night sweats, chills, and fatigue. *Id.* Dr. Muslimani noted a 4 x 4 cm mobile

mass at the 12:00 location in Plaintiff's right breast. Tr. at 1097. He

discussed the pathology, the tumor features, the imaging studies, therapy

options, surgical options, and prognosis with Plaintiff. Tr. at 1099–1100. He

recommended neoadjuvant therapy, genetic counseling, and port placement.

Tr. at 1100. He advised Plaintiff to follow up with her PCP for treatment of

hypertension. *Id.*

On May 9, 2018, Plaintiff reported joint and bone pain and intermittent

fevers associated with RA flare ups. Tr. at 1091. Dr. Muslimani indicated

Plaintiff's treatment was to consist of Trastuzumab 8 mg/kg, Pertuzumab 840

mg, Docetaxel 75mg/m,[2] and Carboplatin AUC of 6 for the first cycle of

chemotherapy and Trastuzumab 6 mg/kg, Pertuzumab 420 mg, Docetaxel 75

mg/m,[2] and Carboplatin AUC of 6 for cycles two through six, occurring every

three weeks. Tr. at 1093. He noted Plaintiff was also to receive

Dexamethasone 8 mg on the days before and after chemotherapy and Neulasta 6 mg SQ on the second day after chemotherapy. *Id.*

On May 22, 2018, Plaintiff complained of diffuse bone and joint pain that had started after she received the Neulasta injection and had progressively worsened. Tr. at 1084. She reported experiencing four days of watery diarrhea with bowel movements more than eight times per day. *Id.* Dr. Muslimani indicated Plaintiff should proceed with a second cycle of chemotherapy at the same dose. Tr. at 1086. He instructed Plaintiff to take Claritin for three days prior to receiving her next Neulasta injection and to continue to take it for three to four days after the injection. *Id.* He indicated Plaintiff should also continue to take Tylenol or ibuprofen as need for pain. *Id.* He expected Plaintiff's joint pain would decrease, as the first injection typically produced more adverse effects. *Id.* He prescribed Lomotil 2.5-0.025 mg four times a day for diarrhea and instructed Plaintiff to take two Imodium tablets each time she experienced a loose stool, but to take no more than 10 tablets per day. *Id.*

Plaintiff followed up with Dr. Graham for unstable blood pressure on May 30, 2018. Tr. at 1541. She indicated she had run out of Clonidine and Losartan. *Id.* She reported stable exertional capacity and denied chest pain and shortness of breath. *Id.* Dr. Graham instructed Plaintiff to resume

Losartan-Hydrochlorothiazide and to check and record her blood pressure readings. Tr. at 1545.

On June 11, 2018, Plaintiff described joint and bone pain that was more severe than that she typically experienced due to RA. Tr. at 1186. She complained of diarrhea that lasted three days and produced more than six bowel movements per day. *Id.* However, she reported some improvement on Lomotil. *Id.* Dr. Muslimani noted positive clinical response with reduction in the right breast mass from 4 x 4 cm to 2 x 2 cm. Tr. at 1188. He advised Plaintiff to proceed with the third cycle of chemotherapy treatment. *Id.* He adjusted Plaintiff's Gabapentin dose and prescribed Prednisone. *Id.*

On June 25, 2018, Plaintiff reported her oncologist had stopped Methotrexate, but she remained on Plaquenil 400 mg daily. Tr. at 1129. She complained of swelling in her ankles and hands, cramping in her knees, and pain in her jaw, chest, hips, knees, and shoulders. *Id.* Her blood pressure was high at 111/91 mmHg. Tr. at 1130. PA McNair noted TTP of the right wrist and jaw with painful and limited opening of the jaw. *Id.* He assessed Sulfasalazine for joint symptoms, but noted Plaintiff's complaints of nerve pain were likely due to chemotherapy treatment, as opposed to RA, and would likely not benefit from the added medication. *Id.* He felt that Plaintiff would benefit from Gabapentin and suggested Plaintiff discuss it with her PCP. *Id.*

19

Plaintiff complained of squeezing chest and throat discomfort on June 27, 2018. Tr. at 1114. Dr. Pierre noted tachycardia on exam and Plaintiff indicated her heart rate had remained high for three days. Tr. at 1115. Plaintiff indicated her heart rate had registered at 130 BPM when she presented for chemotherapy and that she was treated with intravenous fluids and sent home. *Id.* Dr. Pierre assessed unspecified tachycardia and instructed Plaintiff to take Labetalol when she returned home, recheck her heart rate after 30 to 60 minutes, and to seek emergency care if her heart rate was greater than 110 BPM. Tr. at 1116.

Plaintiff also followed up with Dr. Scott on June 27, 2018. Tr. at 1181. Dr. Scott noted Plaintiff was halfway through chemotherapy. *Id.* Plaintiff reported tolerating chemotherapy well and felt as if the mass were getting smaller. *Id.* Her blood pressure was elevated at 149/104 mmHg and 147/98 mmHg and her heart rate was abnormally high at 132 BPM and 112 BPM. Tr. at 1182–83. They discussed prophylactic mastectomy on the left and Dr. Scott advised against it. Tr. at 1183.

Plaintiff continued to complain of generalized bone pain in her upper and lower extremities and shortness of breath on exertion on July 9, 2018. Tr. at 1194. Dr. Muslimani noted Plaintiff was tachycardic with a heart rate of 122 BPM. Tr. at 1195. He postponed Plaintiff's scheduled chemotherapy by a day to obtain a CT arteriogram of her chest and an EKG. *Id.* The CT

arteriogram showed no evidence of pulmonary embolus and was otherwise negative. Tr. at 1201.

On July 17, 2018, Plaintiff reported intermittent blurred vision, eye pain, and vision loss. Tr. at 1118. She indicated Botox injections were working. Tr. at 1120. Dr. Pierre referred Plaintiff for an ophthalmology consultation. *Id.*

On July 19, 2018, Plaintiff reported her heart palpitations had improved somewhat, but her heart rate remained mildly increased. Tr. at 1203. She complained of several episodes of diarrhea per day following infusions. *Id.* Dr. Muslimani instructed Plaintiff to proceed with the fourth cycle of chemotherapy. Tr. at 1207.

Plaintiff presented to Brian Colletto, O.D. ("Dr. Colletto"), for assessment of double vision and light sensitivity on July 23, 2018. Tr. at 1126. Dr. Colletto assessed visual disturbance with recent initiation of chemotherapy and presbyopia. Tr. at 1125. He provided a new prescription for glasses and instructed Plaintiff to monitor her other symptoms for six months. *Id.*

On July 25, 2018, Plaintiff reported chest pain, palpitations, and some dizziness the prior day. Tr. at 1220. She endorsed extreme weakness and fatigue and pain and muscle spasms in the bilateral lower extremities. *Id.* Her blood pressure was 144/92 mmHg and her heart rate was 135 BPM

initially and 110 BPM on a repeat check. Tr. at 1221. An EKG showed sinus tachycardia with no significant ST-segment changes. *Id.* Dr. Muslimani indicated Plaintiff's sinus tachycardia and lower extremity weakness and spasm were unlikely to be related to chemotherapy. *Id.* He advised Plaintiff to contact her cardiologist and rheumatologist for further workup. Tr. at 1222.

Plaintiff reported continued palpitations, but improved blood pressure control on August 1, 2018. Tr. at 1547. Dr. Graham instructed her to wear a cardiac event monitor for 30 days to assess for dysrhythmia and to diet, exercise, and lose weight. Tr. at 1551.

Plaintiff reported tolerating treatment "fairly well" and denied complaints on August 9, 2018. Tr. at 1216. Dr. Muslimani noted Plaintiff remained tachycardic, her systolic blood pressure was above 160, and her diastolic blood pressure was above 105. Tr. at 1217. He informed Plaintiff that her blood pressure needed to be controlled before she could proceed with the next cycle of chemotherapy. *Id.* He ordered two grams of intravenous magnesium and instructed Plaintiff to increase oral magnesium to 400 mg three times a day. *Id.*

On August 16, 2018, Plaintiff's blood pressure was better-controlled, but she admitted she had not been taking all her prescribed blood pressure medications. Tr. at 1231. She endorsed chronic joint pain. *Id.* Dr. Muslimani

authorized Plaintiff to proceed with the fifth cycle of chemotherapy. Tr. at 1232. He recommended Plaintiff take her blood pressure medication as prescribed and start using a heart monitor. *Id.*

Plaintiff underwent a mammogram on August 31, 2018, that showed near complete response of the tumor in the right breast at the 12:00 position. Tr. at 1163–64. The radiologist indicated Plaintiff should proceed with right lumpectomy with Dr. Scott in mid-October. Tr. at 1163.

Plaintiff reported generalized weakness and fatigue on September 6, 2018. Tr. at 1229. Dr. Muslimani indicated the right breast mass was completely undetectable on physical exam. Tr. at 1230. He noted the mammogram showed a positive response to treatment. *Id.* He instructed Plaintiff to proceed with a final cycle of chemotherapy and ordered a magnesium infusion. *Id.* He also instructed Plaintiff to follow up with the surgical team for lumpectomy with axillary sentinel lymph node biopsy. *Id.*

Plaintiff reported intermittent palpitations and tachycardia, but denied symptoms consistent with angina on September 19, 2018. Tr. at 1553. The event monitor revealed no pathologic arrhythmias. *Id.*

On September 20, 2018, Plaintiff complained of severe, loose, watery stools that were occurring more than six times a day, despite her use of Imodium. Tr. at 1244. Dr. Muslimani noted Plaintiff's diarrhea was likely caused by Pertuzumab, but ordered a screening for Clostridium difficile

colitis infection. Tr. at 1245. He decreased oral magnesium to once a day, advised Plaintiff to hydrate well, and indicated he would prescribe Octreotide 100 mcg three times a day if the screening was negative. *Id.*

On October 3, 2018, Dr. Scott noted recent imaging had shown a decrease in size of the mass in Plaintiff's right breast from 3.5 cm to 1 cm. Tr. at 1237. Plaintiff's blood pressure and heart rate were elevated at 155/93 mmHg and 124 BPM, respectively. Tr. at 1241. Plaintiff opted for right total mastectomy, as opposed to lumpectomy, with sentinel node biopsy and immediate reconstruction. Tr. at 1241. Dr. Scott indicated a plastic surgery consultation and coordinated surgery would be scheduled. Tr. at 1242.

Plaintiff also followed up with Dr. Muslimani on October 3, 2018. Tr. at 1247. She reported improvement in diarrhea after reducing oral magnesium and indicated she felt much better. *Id.* Her blood pressure and pulse were elevated at 155/93 mmHg and 124 BPM, respectively. *Id.* Dr. Muslimani assessed hypomagnesemia and indicated he would order intravenous iron, if necessary. Tr. at 1248. He instructed Plaintiff to follow up to discuss neoadjuvant treatment options after Dr. Scott performed surgery. *Id.*

Plaintiff reported a cough, runny nose, sinus congestion, and lower extremity muscle spasms on October 11, 2018. Tr. at 1249. Her blood pressure and heart rate were elevated at 150/92 mmHg and 118 BPM, respectively. *Id.* Dr. Muslimani assessed hypomagnesemia and arranged for

magnesium infusion the following day. Tr. at 1250. He instructed Plaintiff to increase oral magnesium to 400 mcg three times a day and to call if she developed diarrhea. *Id.* He recommended a repeat CT scan for evaluation of a lung lesion. *Id.*

Plaintiff presented to plastic surgeon Snehankita G. Kulkarni, M.D. ("Dr. Kulkarni"), for evaluation for breast reconstruction on October 12, 2018. Tr. at 1321. Dr. Kulkarni examined Plaintiff and informed her of options for reconstruction. Tr. at 1326–28. She recommended Plaintiff lose 35 pounds to reduce her risk of wound-healing complications. Tr. at 1329. Plaintiff indicated she was leaning toward bilateral mastectomy, given a strong family history of breast and other types of cancer. *Id.* Dr. Kulkarni indicated Plaintiff would need to further discuss laterality with her surgical oncologist. *Id.*

On October 16, 2018, a CT scan of Plaintiff's chest failed to reveal the left lower pulmonary nodule that was previously visualized or any new nodules. Tr. at 1333–34. It showed a small soft tissue nodule containing a peripheral calcification in the right breast, but no longer indicated the right breast mass. *Id.* It indicated scattered axillary and mediastinal lymph nodes that were not considered pathologically-enlarged. *Id.*

Plaintiff endorsed improvement in her joint pain, but reported pain in other areas on October 25, 2018. Tr. at 1257. She reported swelling in her

legs after walking, pain, and her legs giving out on her. *Id.* She stated she had sustained two falls. *Id.* She noted she had a rolling walker, but did not have one with a seat. *Id.* Plaintiff's blood pressure and pulse were elevated at 153/107 mmHg and 121 BPM, respectively. Tr. at 1259. PA McNair recorded normal findings on physical exam. Tr. at 1259–60. He indicated the swelling in Plaintiff's legs and her muscle spasms were not caused by RA. Tr. at 1261. He recommended Plaintiff engage in lower-impact exercise, such as using a bike instead of walking. *Id.* He ordered lab studies that showed mild anemia. *Id.*

Plaintiff reported improved cold symptoms on November 1, 2018. Tr. at 1274. She complained of severe bilateral leg edema that was aggravated by walking for about 10 minutes and had last occurred two weeks prior. *Id.* Dr. Pierre observed trace pitting edema in Plaintiff's left lower leg. Tr. at 1276. She referred Plaintiff for ankle brachial index ("ABI") studies, prescribed compression stockings, and indicated she would consider prescribing Lasix. Tr. at 1277.

Plaintiff underwent an ABI study on November 5, 2018, that showed mildly decreased perfusion in the right lower extremity and normal perfusion of the left lower extremity. Tr. at 1292.

On November 13, 2018, Plaintiff's blood pressure and heart rate were elevated at 182/122 mmHg and 117 BPM, respectively. Tr. at 1315. She

reported severe pain in her lower back that radiated to her bilateral legs, causing them to twitch, and sometimes lasting several hours. Tr. at 1317. She indicated she was experiencing one headache per month. *Id.* Dr. Khan observed slowed gait and decreased vibration sense on exam. *Id.* He ordered EMG and NCS testing of the bilateral legs and refilled Topamax. *Id.*

Plaintiff followed up with Dr. Scott for a preoperative evaluation on November 21, 2018. Tr. at 1340. She indicated a desire to undergo bilateral total mastectomy with reconstruction. *Id.* Dr. Scott explained to Plaintiff that there was no survival advantage for left total mastectomy and that she was at increased risk for wound healing complications if she pursued left mastectomy, but Plaintiff desired to go forward with it. *Id.* Dr. Scott indicated Plaintiff had a complex sclerosing lesion involving the right breast at the 9:00 location and a 1 cm residual mass at the 12:00 location that would be addressed during surgery. Tr. at 1341.

Plaintiff's blood pressure was elevated at 178/111 mmHg and her heart rate was 112 BPM on November 29, 2018. Tr. at 1312. She reported one headache flare per month and described severe pain in her legs that was coming from her back, swelling in her legs, and difficulty walking. Tr. at 1314. Dr. Khan noted slowed gait and decreased vibration sense, but indicated EMG and NCV testing showed no significant pathology. *Id.* He assessed small fiber neuropathy. *Id.*

Plaintiff returned to Dr. Kulkarni for a preoperative visit on December 5, 2018. Tr. at 1345. She indicated she had opted to proceed with bilateral mastectomy and immediate tissue expander reconstruction followed by definitive deconstruction with deep inferior epigastric perforator ("DIEP") free flaps after radiation. Tr. at 1353. Dr. Kulkarni marked the area for circumareolar-vertical extension. *Id.*

On December 6, 2018, Dr. Scott performed right total skin sparing mastectomy and sentinel node biopsy and prophylactic left total skin sparing mastectomy. Tr. at 1361–62. Dr. Kulkarni performed bilateral breast reconstruction with immediate placement of tissue expander and subsequent expansion, bilateral breast reconstruction with AlloDerm and acellular dermal matrix, and bilateral multilevel intercostal nerve block. Tr. at 1359–60.

Plaintiff returned to Dr. Kulkarni for follow up on December 14, 2018. Tr. at 1385. She denied fevers, chills, and drainage and was doing well from a surgical standpoint. *Id.*

Plaintiff followed up with Dr. Scott on December 19, 2018. Tr. at 1389. Dr. Scott noted the pathology report reflected a 0.8 cm tumor with approximate tumor cellularity of 5%, negative margins, five negative sentinel nodes, and residual cancer burden class I. *Id.* Plaintiff complained of bilateral leg weakness that had been causing her legs to give out since she started

chemotherapy. *Id.* She indicated she had fallen three times since her surgery and had required a walker. *Id.* She also complained of feeling faint and lightheaded. *Id.* Dr. Scott observed Plaintiff's incisions to show no signs of infection and her Jackson Pratt ("JP") drains to be intact with serous drainage. Tr. at 1390. She noted the JP drain output was too high for removal at that time and recommended Plaintiff follow up with Dr. Kulkarni as to drain removal. *Id.* She referred Plaintiff to radiation oncology to determine if postmastectomy radiation therapy to the right chest wall was needed. *Id.* She recommended Plaintiff follow up with Dr. Muslimani as to leg weakness and with her PCP as to feeling faint and lightheaded. *Id.*

On January 4, 2019, state agency medical consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; frequently handle and reach in front, laterally, and overhead with the right upper extremity; and avoid concentrated exposure to hazards, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. Tr. at 286–90, 307–11.

Dr. Kulkarni performed debridement of necrotic mastectomy on January 14, 2019. Tr. at 1427.

Plaintiff followed up with physician assistant Amanda McKeever ("PA McKeever") in Dr. Kulkarni's office on January 18, 2019. Tr. at 1427. She endorsed some pain that was managed with Gabapentin and Tylenol and indicated she was doing well from a surgical standpoint. *Id.*

On February 1, 2019, a transthoracic echo showed no significant change from the prior study. Tr. at 1514. Plaintiff's estimated LVEF was 60–65%. *Id.*

On February 2, 2019, Plaintiff complained of constant, worsening pain in her bilateral arms, legs, hands, and jaws. Tr. at 2162. She also reported numbness and tingling in her arms and tingling in her legs. *Id.* Dr. Pierre noted generalized soreness to touch in Plaintiff's neck, shoulder, back, arms, and legs. Tr. at 2165. She assessed differential diagnoses of fibromyalgia versus neuropathy triggered by chemotherapy or stress from breast cancer treatment and surgery. *Id.* She prescribed Cymbalta 30 mg. *Id.*

Plaintiff followed up with Dr. Muslimani on February 7, 2019. Tr. at 1662. She reported recovering well from surgery and indicated numbness in her hands was improving. *Id.* Dr. Muslimani discussed treatment options and explained that Plaintiff would be ineligible for adjuvant endocrine therapy because she had hormonal negative breast cancer. Tr. at 1668. He

30

recommended she proceed with adjuvant Herceptin. Tr. at 1669. He recommended Plaintiff follow a low-fat, high-fiber diet, avoid alcohol and tobacco, exercise for 30 to 45 minutes at least five times a week, and lose weight. *Id.*

Plaintiff received her first Herceptin infusion on February 12, 2019. Tr. at 1724.

On February 22, 2019, PA McKeever encouraged Plaintiff to work on weight loss prior to DIEP surgery and referred her to a nutritionist. Tr. at 1474.

Plaintiff received a Herceptin infusion on March 5, 2019. She reported generalized pain that Dr. Muslimani indicated might be caused by her RA. Tr. at 1740.

On March 20, 2019, Plaintiff reported doing well following mastectomy and being stable from a cardiovascular perspective. Tr. at 1559. She complained of daily headaches. *Id.* Dr. Graham noted Plaintiff's congestive heart failure appeared to be asymptomatic, consistent with NYHA class I. Tr. at 1564. She continued Plaintiff's medication regimen and encouraged diet, exercise, and weight loss. *Id.*

On March 21, 2019, Plaintiff reported feeling well, aside from experiencing muscle spasms that came and went without clear triggers and swelling in her bilateral ankles. Tr. at 1761. Her blood pressure was elevated

at 160/109 mmHg. Tr. at 1766. Dr. Muslimani ordered a check of Plaintiff's magnesium level and continued treatment with Herceptin. Tr. at 1769.

Plaintiff received a Herceptin infusion on March 26, 2019. Tr. at 1804.

Plaintiff complained of constant, worsening pain in her bilateral arms, legs, and jaws on April 1, 2019. Tr. at 2168. She endorsed numbness and tingling in her arms and tingling in her legs. *Id.* She also complained of RA-related pain in her bilateral shoulders, wrists, hands, knees, and ankles. *Id.* She indicated her pain was aggravated by gripping, standing, and walking. *Id.* She endorsed fatigue. *Id.* Dr. Pierre assessed neuropathy and noted it was most likely a side effect from chemotherapy. Tr. at 2172. She stopped Gabapentin and Cymbalta and prescribed Lyrica 50 mg. *Id.* She also ordered lab studies and referred Plaintiff to a new rheumatologist. *Id.*

Plaintiff presented for a Herceptin infusion on April 16, 2019. Tr. at 1832. Her blood pressure was significantly elevated at 173/135 mmHg on a first check and 164/124 mmHg on a second check, causing Dr. Muslimani to hold off on further Herceptin treatment pending her follow up with a cardiologist. Tr. at 1833, 1841.

On April 23, 2019, a CT scan of Plaintiff's chest showed no pulmonary nodules or other significant abnormalities. Tr. at 1500.

On May 1, 2019, Plaintiff reported her chemotherapy was on hold until her blood pressure was better controlled. Tr. at 1565. She indicated her blood

pressure had been 180/120 mmHg on two occasions when she presented for Herceptin infusions. *Id.* She endorsed medication compliance and denied missing doses. Tr. at 1569. Dr. Graham increased Labetalol to 400 mg twice daily and ordered lab studies and a renal duplex scan. *Id.*

Plaintiff also followed up with Dr. Pierre on May 1, 2019. Tr. at 2175. She described constant numbness and paresthesia in her bilateral arms and legs, skin sensitivity and pain with touch, and stabbing pain in her feet while walking. Tr. at 2175. Dr. Pierre noted Plaintiff's insurance provider had declined to cover Lyrica because she had not maxed out the dosage of Gabapentin. *Id.* She observed generalized TTP of Plaintiff's muscles. Tr. at 2178. She prescribed Gabapentin 600 mg three times a day for neuropathy and encouraged Plaintiff to exercise. *Id.*

Plaintiff complained of muscle spasms, chronic joint pain, fatigue, lack of energy, and bilateral ankle swelling on May 2, 2019. Tr. at 1880. Dr. Muslimani authorized continuation of Herceptin treatment. Tr. at 1884. Plaintiff underwent a Herceptin infusion the same day. Tr. at 1862.

On May 14, 2019, a transthoracic echo showed no significant interval change from the February 2019 study. Tr. at 1524.

Plaintiff received a Herceptin infusion on May 28, 2019. Tr. at 1929.

On June 3, 2019, a renal artery ultrasound and renal arterial duplex scan showed no evidence of renal artery stenosis and no evidence of cystic involvement or hydronephrosis. Tr. at 1571.

Plaintiff complained of pain in her left breast and arm pit on June 14, 2019. Tr. at 1953. Her blood pressure was elevated at 162/122 mmHg. Tr. at 1957. Dr. Muslimani advised Plaintiff to participate in physical therapy to help loosen up scar tissue in her left breast. Tr. at 1958. He continued Herceptin treatment. *Id.*

Plaintiff presented for a Herceptin infusion on June 18, 2019. Tr. at 1993. A physician authorized the medical assistant to proceed with Herceptin infusion, despite Plaintiff's complaint of burning beside her port access. *Id.*

On June 19, 2019, Plaintiff complained of constant numbness and paresthesia in her bilateral arms and legs. Tr. at 2181. She indicated Gabapentin helped for the first week. *Id.* She reported her legs were giving out when she was walking and bending. *Id.* Dr. Pierre noted tenderness in Plaintiff's lumbar spine. Tr. at 2183. She increased Gabapentin to 800 mg every eight hours and ordered x-rays of Plaintiff's lumbar spine. Tr. at 2184.

Plaintiff received a Herceptin infusion on July 9, 2019. Tr. at 2027. She reported fatigue and headache. Tr. at 2032, 2034.

On July 19, 2019, Plaintiff complained of bilateral numbness, sharp and stabbing pain all over, neck stiffness, paresthesia, tingling, jaw pain

radiating to her ears and neck, pain in her wrists and low back, and swelling in her ankles. Tr. at 2187. She felt as if her pain had worsened. *Id.* Her blood pressure was 156/118 mmHg on a first check and 190/110 mmHg on a second check. Tr. at 2190. Dr. Pierre assessed an acute flare of RA and treated Plaintiff with Toradol and Solumedrol injections. Tr. at 2191.

Plaintiff presented to rheumatologist Ashrito Dayal, M.D. ("Dr. Dayal"), on July 23, 2019, for evaluation and treatment of RA. Tr. at 1580. She reported that she had been placed on Methotrexate for treatment of RA, but that it was stopped in May 2018, as she was undergoing chemotherapy. *Id.* She noted she was started on Plaquenil and Sulfasalazine in May 2018 and continued to take the medications. *Id.* She complained of aching and stiffness in the joints of her hands, wrists, knees, and back and endorsed a longstanding history of fibromyalgia with treatment for pain control. *Id.* Her blood pressure was elevated at 174/118 mmHg. Tr. at 1581. She rated her pain as a six. *Id.* Dr. Dayal observed no synovitis in the small joints of Plaintiff's hands and wrists; tenderness in a few PIP and MCP joints; residual synovitis in the wrist joints; normal shoulders and elbows; pes planus in the lower extremities; no synovitis in the metatarsophalangeal ("MTP") and midfoot joints; no heel tenderness; normal ankle joints; crepitus and mild tenderness in the bilateral knees; full range of motion of the hip joints; minimal discomfort on internal rotation of the right hip; normal

35

cervical spine, lumbar spine, and sacroiliac joints; 5/5 motor strength; and no tender points on muscle exam. Tr. at 1581. He assessed mildly active seronegative, CCP-positive RA, osteoarthritis of the knee joints and lumbosacral spine, and fibromyalgia/chronic pain syndrome. Tr. at 1582. He prescribed Methotrexate 12.5 mg once a week and folic acid 2 mg daily; continued Plaquenil 200 mg twice a day; increased Sulfasalazine 500 mg to two tablets twice a day; ordered lab studies; and encouraged diet, exercise, weight loss, and podiatry evaluation. *Id.*

On July 26, 2019, Plaintiff complained of hot flashes, generalized weakness, fatigue, and chronic joint pain. Tr. at 2048. Her blood pressure was elevated at 164/109 mmHg. Tr. at 2052. Dr. Muslimani advised Plaintiff to take 1000 to 2000 units of vitamin D nightly, recommended diet and exercise, and continued Herceptin treatment. Tr. at 2054.

Plaintiff received a Herceptin infusion on July 30, 2019. Tr. at 2102. She reported body aches. *Id.*

On August 16, 2019, Plaintiff reported joint instability, joint tenderness, tingling in her legs, and severe, constant pain in her low back, knees, hands, and jaw. Tr. at 2194. She described low back pain that radiated down her legs and caused her legs to give out, resulting in falls. *Id.* She reported jaw pain with chewing. *Id.* Plaintiff's blood pressure was 164/132 mmHg on a first check and 176/118 mmHg on a second check. Tr. at 2197. Dr.

Pierre noted tenderness in Plaintiff's lumbar spine and bilateral hands and knees. *Id.* She added Minoxidil 2.5 mg for hypertension, Celebrex for RA, and Cymbalta for neuropathy. Tr. at 2197–98. She indicated she would resubmit a request for Lyrica. Tr. at 2198.

On August 20, 2019, Plaintiff received a Herceptin infusion. Tr. at 2136. She complained of fatigue. Tr. at 2149.

Plaintiff complained of intermittent tightness and burning/shooting pain in her right tissue expander on September 10, 2019. Tr. at 2218. PA McKeever explained it was likely nerve pain and encouraged Plaintiff to take Gabapentin and to wear a compressive sports bra to address any swelling. *Id.* She encouraged Plaintiff to lose weight prior to proceeding with DIEP surgery. *Id.*

On September 19, 2019, Plaintiff reported her blood pressure continued to fluctuate. Tr. at 2416. She rated pain in her bilateral jaws, neck, low back, hands, hips, and ankles as a six. *Id.* Dr. Pierre increased Minoxidil to 5 mg twice a day for hypertension, prescribed a Prednisone taper, and replaced Ranitidine with Cimetidine with Omeprazole for gastroesophageal reflux disease ("GERD"). Tr. at 2420.

Plaintiff also received a Herceptin infusion on September 10, 2019. Tr. at 2255.

On September 23, 2019, Plaintiff reported joint pain, stiffness and aching in her back and hips, and markedly elevated blood pressure. Tr. at 2445. Dr. Dayal observed moderate bilateral pitting pedal edema, tenderness in a few PIP and MCP joints, residual synovitis in the wrist joints, bilateral pes planus, crepitus and mild tenderness in the bilateral knee joints, and minimal discomfort on internal rotation of the right hip. Tr. at 2446. He assessed improving RA and increased Methotrexate to 15 mg once a week. *Id.*

Dr. Pierre partially completed several opinion forms on October 9, 2018. Tr. at 2201–04. On a physical capacities evaluation, Dr. Pierre opined that Plaintiff could sit for two hours in an eight-hour day, stand/walk for less than one hour in an eight-hour, and would need an opportunity to alternate sitting and standing at will throughout the day. Tr. at 2201. She indicated Plaintiff would require a functional capacity exam to assess her abilities to lift, carry, and perform postural maneuvers. Tr. at 2202. She confirmed Plaintiff suffered from fatigue for which there was a reasonable medical basis, but indicated "unknown" in response to a question as to whether the fatigue prevented her from working full-time, even in a sedentary position. *Id.* She completed a second form addressing the physical effects of Plaintiff's pain. Tr. at 2203. She confirmed that Plaintiff suffered from pain for which there was a reasonable medical basis and noted she had RA. *Id.* She felt that Plaintiff's pain was disabling to the extent that it would prevent her from

working full-time at even a sedentary position. *Id.* She completed a third form as to the mental effects of pain. Tr. at 2204. She opined that Plaintiff's pain would interfere with tasks requiring sustained attention and concentration. *Id.*

Plaintiff received her last Herceptin infusion on October 14, 2019. Tr. at 2300.

On October 18, 2019, Plaintiff complained of severe bone pain that was interfering with her mobility, numbness in her legs, and lower back pain that radiated to her lower extremities. Tr. at 2326. Her blood pressure was elevated at 172/137 mmHg. Tr. at 2331. Dr. Muslimani ordered an MRI of Plaintiff's lumbar spine and port removal and referred her to a neurologist for evaluation of lower back pain. Tr. at 2333.

Plaintiff presented to Sushi Das, M.D. ("Dr. Das"), for a consultative exam on November 18, 2019. Tr. at 2206. She reported back spasms/bulging disc, pinched nerve, difficulty with standing/walking, asthma, right elbow fracture, hypertension, heart palpitations, and migraines. *Id.* Dr. Das reviewed a rheumatologist's note that reflected seronegative and mild RA. *Id.* He examined Plaintiff's ears, nose, throat, vision, chest, heart, abdomen, and extremities. Tr. at 2207. He performed limited neurological and mental status exams, recording normal findings. *Id.* He wrote: "Overall this lady is fairly overweight. There are no positive physical findings. She is very healthy

39

and agile." *Id.* He completed a medical statement of ability to do work-related activities (physical) form, indicating Plaintiff was able to do the following: continuously lift and carry 21 to 50 pounds; sit, stand, and walk for eight hours at a time and for eight hours each in an eight-hour workday; continuously reach overhead and in all other directions, handle, finger, feel, and push/pull with the bilateral upper extremities; continuously operate bilateral foot controls; frequently climb ladders and scaffolds; continuously balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; frequently tolerate unprotected heights; and continuously tolerate moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. Tr. at 2208–13.

Plaintiff presented to physician assistant Kim Nathan ("PA Nathan") on November 18, 2019. Tr at 2371. She complained of fatigue, difficulty falling asleep, waking due to leg and arm spasms and low-back pain, 45-pound weight gain over the prior six months, intermittent spasms in her legs and arms, bony pain, back problems, anxiety, worry, memory issues, and mild neuropathy with intermittent tingling of the fingers, toes, and bottoms of the feet. Tr. at 2371–72. Plaintiff's blood pressure was elevated at 173/138 mmHg. Tr. at 2374. PA Nathan contacted Dr. Graham's office as to Plaintiff's blood pressure and instructed her to go home and take the medication she

was prescribed specifically for elevated readings. Tr. at 2372. She instructed Plaintiff to go to the emergency room if she developed a headache, chest pain, or visual symptoms, as she was at high risk for a stroke. *Id.*

Plaintiff reported doing a lot better and denied new swelling of her peripheral joints on November 25, 2019. Tr. at 2476. She endorsed achiness in her knees and back and occasional back spasms. *Id.* An MRI of Plaintiff's lumbar spine showed a mild disc protrusion at L5–S1. *Id.* Plaintiff's blood pressure was elevated at 165/128 mmHg. Tr. at 2477. She rated her pain as a six. *Id.* Dr. Dayal observed moderate bilateral pitting pedal edema, stiffness on active ROM of the shoulders, crepitus and mild tenderness in the bilateral knees, and minimal discomfort on internal rotation of the right hip. *Id.* He increased Methotrexate to 17.5 mg in two divided doses per week and Plaquenil to two tablets daily. Tr. at 2477–78.

On December 18, 2019, Plaintiff complained of right chest tightness and discomfort that radiated to the right side of her back. Tr. at 2423. She also reported nausea and left lower quadrant abdominal pain. *Id.* An EKG was normal. Tr. at 2427. Dr. Pierre indicated Plaintiff's chest pain was likely musculoskeletal. *Id.* She also assessed muscle spasm of the back and prescribed a muscle relaxant. *Id.* She sent Plaintiff's urine for a culture and treated her for a urinary tract infection. *Id.*

Plaintiff complained of moderate-to-severe bilateral shoulder pain on January 3, 2020. Tr. at 2430. Dr. Pierre observed muscle spasms in Plaintiff's cervical and thoracic spines. Tr. at 2433. She prescribed Baclofen 10 mg and ordered x-rays of Plaintiff's cervical spine that showed cervical spondylosis and degenerative disc disease at C5–6. Tr. at 2413, 2433.

Plaintiff reported some improvement to her neck pain on January 17, 2020. Tr. at 2540. She described radiation of pain to the bilateral upper arms, elbows, forearms, wrists, and hands and noted occasional severe episodes were not helped by the muscle relaxant. *Id.* She complained that Labetalol 300 mg had decreased her blood pressure to the 90s/50s, causing her to feel as if "she w[ere] going to die." *Id.* Plaintiff's blood pressure remained elevated at 160/114 mmHg and 146/120 mmHg during in-office monitoring. Tr. at 2543. Dr. Pierre observed a muscle spasm in Plaintiff's thoracic spine. *Id.* She prescribed Jardiance 10 mg and referred Plaintiff to a nutritionist for a new diagnosis of type 2 diabetes and changed Labetalol to 100 mg every eight hours. Tr. at 2544.

Plaintiff reported continued improvement with her medication on January 30, 2020. Tr. at 2508. She indicated she had been able to do a little more exercise and walking, but endorsed pain in the right ankle and right midfoot area and occasional difficulty bearing weight. *Id.* Dr. Dayal noted EMG and NCV studies of Plaintiff's left upper extremity and bilateral lower

extremities were negative. *Id.* Plaintiff's blood pressure was elevated at 160/113 mmHg. Tr. at 2509. Dr. Dayal observed mild bilateral pitting pedal edema, minimal tenderness in Plaintiff's right ankle joint, mild tenderness and crepitus in the bilateral knees, and minimal discomfort on internal rotation of the right hip. Tr. at 2509. He increased Methotrexate to 20 mg to be administered in two divided doses once a week. *Id.*

On February 6, 2020, Dr. Pierre noted tenderness in Plaintiff's cervical spine and muscle spasm in her thoracic spine. Tr. at 2550. She indicated Plaintiff's hemoglobin A1C was 8.6%. *Id.* She added Metformin ER 500 mg with breakfast and increased Jardiance to 25 mg for diabetes. *Id.* She also added Colecoxib for RA. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    Hearing on October 16, 2019

Plaintiff denied having worked or looked for work since the ALJ issued a prior unfavorable decision on June 6, 2017. Tr. at 99. She testified she had initially received long-term disability benefits due to right arm and shoulder problems that prevented her from performing her job, but the benefits ended. Tr. at 100.

Plaintiff stated she had previously worked for Boral Stone Products as a packer. *Id.* She described pulling stones, lifting and inspecting them, packaging them in boxes for shipping, placing 12 boxes on a pallet, and transporting the pallets to a warehouse using a forklift. Tr. at 100–01. She explained she had previously worked for Owens Corning before it was acquired by Boral Stone Products. Tr. at 102. She indicated she had done some of the same work for Owens Corning, but had also been required to pull stones weighing 10 to 20 pounds from a mold, inspect them, place them on a conveyor for drying, make boxes, and lift boxes weighing up to 50 pounds from a line to a pallet. Tr. at 102–03.

Plaintiff stated she was not married. Tr. at 104. She said she lived with her two daughters, ages 17 and 24. Tr. at 104, 105. She indicated she was 5'4" and weighed 250 pounds. Tr. at 104. She stated she had gained 50 pounds due to steroid injections for pain. Tr. at 105.

Plaintiff said she continued to receive chemotherapy treatment and had recently received an infusion. *Id.* She indicated she would likely require two more sessions of chemotherapy. *Id.*

Plaintiff testified she was disabled due to severe pain and fatigue. *Id.* She stated simple tasks like combing her hair made her feel short of breath. *Id.* She said she had difficulty lifting without falling, at times. *Id.* She

described numbness in her limbs, hands, feet, legs, and back. *Id.* She said she had difficulty with her memory and focus. *Id.*

Plaintiff stated her pain had worsened since the ALJ's June 2017 decision. *Id.* She indicated she had been diagnosed with cancer, RA, osteoarthritis, and nerve damage since then. Tr. at 105–06. She described her bones as "ach[ing] like somebody is sitting on them." Tr. at 106. She said her vision had worsened with her migraines. *Id.* She indicated she was not driving because she would sometimes fall asleep while talking to someone. *Id.*

Plaintiff stated she had pain in her feet, knees, hips, lower back, hands, right elbow, shoulder, and neck. *Id.* She described migraines as lasting for three days and occurring three times a month. *Id.* She said they were accompanied by dizziness, visual disturbance, and nausea and required she lie down in complete silence and darkness. *Id.* She admitted to having headaches prior to starting chemotherapy, but noted they had not been as severe. *Id.*

Plaintiff described squeezing chest pain that lasted for 20 to 40 seconds at a time and occurred three or four times a day. Tr. at 106–07. She stated her chest pain was triggered by minimal activity like moving from one room to another. Tr. at 107. She said she experienced daily pain in her back that was sometimes dull and other times so severe she could not deal with it. *Id.* She described it as pulling, burning, and like pins at times, sore and numb at

other times, and shooting down her right leg and causing her to drag her right leg and stumble and fall due to numbness. *Id.* She stated she experienced tingling throughout her legs and pain off and on. *Id.* She noted her right leg was worse than her left. *Id.* She said she felt as if she were being stabbed in her legs and the bottoms of her feet. Tr. at 107–08. She indicated the bottoms of her feet burned and felt numb over multiple approximately 30-minute periods throughout the day. Tr. at 108. She admitted she had difficulty with balance when her feet felt numb. *Id.* She said she sometimes felt numbness from her hips to her feet. *Id.*

Plaintiff described pain in her neck, behind her ears, and in her right shoulder as like pins and needles with burning, numbness, and sensitivity to touch. Tr. at 108–09. She stated her right elbow "ache[d] like a toothache all the time." Tr. at 109. She testified her hands would sometimes swell so much that she could not close her fist to grasp items. *Id.* She said she experienced daily swelling in her bilateral arms, legs, and feet. *Id.* She indicated she had difficulty straightening her arms when she attempted to reach. *Id.*

Plaintiff testified she had difficulty with joints in her knees, wrists, hips, and toes. *Id.* She said she was sometimes unable to wear shoes. *Id.* She described pain as feeling "like someone is stabbing the nerves" and "like a balloon has been blown up and then let out." Tr. at 110. She indicated she felt achy, stabbing pain in her nerves and throbbing pain due to arthritis. *Id.*

Plaintiff testified she was often tired all day. *Id.* She said she felt tired when combing her hair, walking to the car, and attending doctors' appointments. *Id.* She said she sometimes did not want to get out of bed. *Id.* She said she did not feel like doing anything on three or four days a week. *Id.*

Plaintiff admitted she sometimes drove within about five minutes of her home. *Id.* She said numbness in her foot caused her to be unable to feel her foot pressing the brake pedal. *Id.* She indicated she would also fall asleep while driving. *Id.*

Plaintiff stated she would sleep for three hours, at most, during the night due to pain. *Id.* She said she would get up and sit in a chair for a while before attempting to go back to sleep. Tr. at 110–11. She explained she would alternate between the bed and the recliner. Tr. at 111. She said she napped during the day and would sometimes fall asleep while having a conversation with a family member because she felt so tired. *Id.* She indicated she would sleep for 20 to 30 minutes at a time. *Id.* She said she elevated her legs at waist-height while she sat in a recliner. *Id.* She explained that elevating her legs helped with her circulation, cramping, and pain. Tr. at 112. She stated she alternated between her bed and the recliner throughout a typical day, spending four hours of an eight-hour period with her feet elevated in the recliner. *Id.* She said she could not maintain a seated position for four hours due to pain in her back and hips. *Id.* She indicated she would sit for a while

47

with her feet up, go to the restroom, walk around for a little while, and lie down in the bed. *Id.*

Plaintiff estimated she could sit in a straight chair for 45 minutes to an hour. *Id.* She testified she would feel stiff and have shooting pain from the middle of her back to her hips after sitting for a lengthy period. *Id.* She said she could stand for 15 to 20 minutes prior to experiencing a pulling and burning sensation. Tr. at 113. She noted that if she tried to stand for longer, she was likely to fall. *Id.* She said she could walk for 10 minutes or less. *Id.* She indicated she did not lift over 10 pounds due to pain. *Id.*

Plaintiff testified her daughters performed most of the household chores. *Id.* She said she would sit to fold clothes and would watch her daughters as they prepared meals. *Id.* She indicated she could heat pre-made meals in the oven. *Id.* She stated her daughter did most of the grocery shopping, but she might pick up an item. *Id.* She said she could not walk for long enough to shop for groceries. *Id.* She stated she would visit a store to pick up milk or medicine and would attend her doctors' appointments, but did not go to movies or attend her daughter's sporting events because she could not sit and stand for the required periods. Tr. at 114. She indicated she used a rolling walker with a seat three or four times a month, at most. *Id.* She admitted she was not using it as frequently since she started receiving injections and steroids. *Id.* She said she had started using a cane, but

pushing down on it with her right arm had increased her pain and nerve damage. *Id.*

Plaintiff testified she had previously read for pleasure, but no longer did so because she had to reread things several times to comprehend them. *Id.* She said her mind tended to wander such that she was not focusing on what she was reading. Tr. at 115.

Plaintiff stated several of her medications caused dizziness, sleepiness, and prevented her from operating cars. *Id.* She said her concentration was affected at times, such that she could not find words during conversation. *Id.*

Plaintiff indicated she used a chair in her shower because she could not stand for long enough to bathe. *Id.* She stated her family sometimes helped her clean areas she could not reach. *Id.* She said her sister would wash her hair because she had difficulty with grip and reaching overhead. *Id.* She explained that she typically wore sweatpants and pull-over shirts because she could not use her hands to button buttons or tie shoes. *Id.*

Plaintiff stated she had increased difficulty using her hands because chemotherapy had worsened problems due to RA and osteoarthritis. Tr. at 116. She said the swelling and nerve problems sometimes caused her to be unable to grip items. *Id.* She indicated her medical providers had explained that the chemotherapy had caused her nerves to be overly sensitive, leading

to heightened pain. *Id.* She explained the numbness caused by neuropathy and discs in her back caused her to drag her feet. *Id.*

Plaintiff denied driving any significant distance. Tr. at 117. She said she could not go far because she had to move every 45 minutes. *Id.* She indicated she was supposed to handle the bookkeeping for her daughter's team, but could not do it because of her chemotherapy. Tr. at 118. She said she would purchase items and send them for bake sales. *Id.* She noted her older daughter was pregnant and had approached her about caring for the baby, but she indicated she did not feel it would be safe for her to take on such a responsibility, as she might fall or drop the baby. Tr. at 119. She said her brother maintained her yard. *Id.* She stated her daughter had a dog, but she did not care for the dog, aside from letting it outside occasionally. *Id.*

Plaintiff testified she anticipated receiving two more chemotherapy treatments three weeks apart. Tr. at 120. She said recent imaging had shown no further evidence of cancer, and she was waiting to undergo reconstructive surgery. *Id.*

Plaintiff stated her asthma no longer flared up as often because she was not working around dust in a plant. Tr. at 120–21. She said her doctor had stopped Methotrexate, but had recently restarted it. Tr. at 121. She stated she also took Gabapentin. *Id.* She testified her feet would swell and go numb and she would feel a pin-like sensation in the bottoms of her feet and

be unable to bend her toes at times. Tr. at 121–22. She noted she tried to wear open-toed shoes because it was painful to put on shoes. Tr. at 122. She said she would walk with her daughters for 10-minute periods and watch movies with them at home. *Id.* She indicated she had last volunteered at her daughter's school in 2017, working concessions and a ticket booth. Tr. at 122–23. She stated she attempted stretching exercises and had requested to participate in a water aerobics class. *Id.* She indicated she had attempted an exercise class, but it repeatedly caused her back to "go out" and her to be unable to get up. *Id.*

### ii.    Hearing on March 25, 2020

Plaintiff testified as to her exam with Dr. Das. Tr. at 66. She stated she was unable to bend or extend her right arm as far as Dr. Das wanted, and he pushed her to extend it further. *Id.* She represented the exam lasted only about 10 minutes. *Id.* She indicated that since her exam with Dr. Das, she had been diagnosed with diabetes and deterioration in her neck, jaw, and bilateral shoulders with pain and numbness. *Id.*

Plaintiff stated she typically woke around 5:30 a.m. due to pain. Tr. at 67. She testified she would bathe and sit fully extended in a recliner on and off for about six of eight hours. *Id.* She said her feet were typically at waist-height. *Id.* She indicated she did a little walking inside her house for exercise,

but not a lot because her legs would give out if she attempted to walk for too long. *Id.*

Plaintiff testified she experienced pain in her neck, jaw, bilateral shoulders, lower back, hip, knees, feet, toes, and bilateral hands. Tr. at 67–68. She said her hands and feet tingled and went numb throughout the day and sometimes prevented her from touching items and walking due to soreness. Tr. at 67–68. She indicated she experienced migraines that might last three days, were worsened by light and sound, made her feel nauseated, and required she lie down, as her medication was ineffective. Tr. at 68.

Plaintiff said her medication caused dizziness, made her sleepy most of the time, caused blurred vision, and affected her balance. Tr. at 68, 69. She indicated she slept during the day, waking due to cramps and spasms. Tr. at 68. She stated she felt as if she were experiencing lingering symptoms from chemotherapy, including pain in her bones and nerves. *Id.* She said her bone pain felt like twisting and noted she had daily pain in her arms and legs. Tr. at 68–69.

Plaintiff admitted she read, but said she had difficulty concentrating on what she was reading. Tr. at 69. She noted she would read things over and over and would often forget what she read. *Id.* She said her sister monitored her medication because she sometimes could not recall if she had taken it. *Id.*

Plaintiff stated she had seen Drs. Graham and Pierre since the prior hearing. Tr. at 70. She said she visited the heart doctor for her uncontrolled blood pressure. *Id.* She indicated the medication lowered her blood pressure, but it increased prior to her next dose. *Id.* She said she drove if she had no one to drive her, but preferred not to drive because she had blurred vision and fell asleep while driving. Tr. at 70–71, 74. She also stated she had numbness in her hands and feet. Tr. at 74. She testified she checked her blood glucose three times a day and her results ranged from 220 to 330 mg/dL. Tr. at 71.

Plaintiff denied being able to walk long distances due to knee and lower back pain and soreness in her feet. *Id.* She said she would have to stop or she would fall. *Id.* She estimated she could walk six yards or less. *Id.* She indicated she could sit for 40 minutes to an hour. Tr. at 72. She estimated she could stand for about 15 minutes. *Id.* She described shooting pain down her legs, numbness, and tingling that necessitated she sit. *Id.* She said she had difficulty turning items like a doorknob and the top on a water bottle. *Id.* She indicated she had difficulty reaching, which affected her ability to bathe herself and reach overhead to wash her hair. Tr. at 72–73. She said she only wore pull-on clothes and shoes without laces because of pain in her hands and shoulders and difficulty bending. Tr. at 73. She testified she slept for two hours at a time and a total of four to five hours per night because of

cramping. *Id.* She stated she experienced dizziness that sometimes caused her to fall. *Id.* She said she had swelling in her shoulders, neck, hands, knees, and feet. Tr. at 74. She indicated she had pain in her legs, arms, hands, feet, and shoulders due to fibromyalgia. *Id.* She noted she had tender points in her neck, shoulders, arms, elbows, knees, and hips. *Id.*

Plaintiff testified her provider had indicated the wall around her heart had thickened due to her uncontrolled hypertension. Tr. at 75. She stated her blood pressure remained high. Tr. at 76. She indicated her weight had increased by at least 50 pounds. Tr. at 77. She said she felt "really tired." *Id.* She stated she took eight Methotrexate pills on Sundays. *Id.* She stated she had not noticed improvement, but had recently started the increased dose. Tr. at 77–78.

b.    Vocational Expert Testimony

i.    Hearing on October 16, 2019

Vocational Expert ("VE") Luisa Seuss reviewed the record and testified at the hearing. Tr. at 103, 123–26. The VE categorized Plaintiff's PRW as a hand packager, *Dictionary of Occupational Titles* ("*DOT*") No. 920.587-018, requiring medium exertion and a specific vocational preparation ("SVP") of 2, and a material handler, *DOT* No. 929.687-030, requiring heavy exertion and an SVP of 3. Tr. at 103. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with the

following additional limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and reach; avoid concentrated exposure to extreme cold, extreme heat, humidity, dust, odors, fumes, pulmonary irritants, unprotected heights, moving mechanical parts, and bright light, defined as light brighter than standard office lighting; and should not operate heavy equipment or motorized machinery. Tr. at 123–24. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 124. The ALJ asked whether there were any other jobs in the economy the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of 2 as an order clerk, *DOT* No. 209.567-014, a charge account clerk, *DOT* No. 205.367-014, and a final assembler, *DOT* No. 713.687-018, with 19,000, 34,000, and 25,000 positions in the national economy, respectively. *Id.*

The ALJ next asked the VE to consider the limitations in the first hypothetical question, but to further assume the individual could perform occasional handling and fingering. *Id.* He asked if the restriction would preclude the jobs the VE previously identified. *Id.* The VE testified the additional restriction would preclude all competitive employment. *Id.*

The ALJ asked the VE to state her opinion as to the amount of time off task that would be tolerated in a workplace. Tr. at 124–25. The VE stated

that up to 10 percent of time off task would generally be tolerated and that any greater percentage of time off task would preclude all work. Tr. at 125.

The ALJ asked the VE to provide her opinion as to sitting and standing tolerances in the jobs she identified. *Id.* The VE testified that sedentary jobs would generally allow a sit/stand option for up to 10 minutes out of a 30-minute period if the individual remained on task. *Id.*

The ALJ asked the VE to consider the hypothetical individual would only be able to sit, stand, and walk for no more than three hours combined in an eight-hour workday. *Id.* He asked if that would preclude all work. *Id.* The VE confirmed it would. *Id.*

Plaintiff's counsel asked the VE to consider the individual would be able to sit for no more than two hours and stand or walk for less than one hour in an eight-hour workday. Tr. at 126. He asked if those restrictions would prevent the individual from working. *Id.* The VE confirmed they would. *Id.*

The ALJ asked the VE to explain whether her testimony fell outside of or conflicted with the information in the *DOT*. *Id.* The VE explained the *DOT* addressed climbing in general terms and did not specifically address climbing of ramps, stairs, ladders, ropes, and scaffolds. *Id.* She further noted testimony as to a sit/stand option and time off task was based on her experience and education. *Id.*

56

ii.    Hearing on March 25, 2020

VE Cheryl Richardson testified at the second hearing. Tr. at 78–80. Plaintiff's attorney asked the VE to consider that the hypothetical individual would be limited to sitting for no more than two hours in an eight-hour workday and standing and walking for less than one hour in an eight-hour workday. Tr. at 80. He asked the VE if the restrictions would preclude all work. *Id.* The VE confirmed they would. *Id.*

2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2019.
2.    The claimant has not engaged in substantial gainful activity since June 7, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: obesity; post right upper extremity open reduction and internal fixation (ORIF); hypertension; degenerative disc disease of the cervical and lumbar spine; congestive heart failure; status post bilateral mastectomy; rheumatoid arthritis; asthma; fibromyalgia; osteoarthritis bilateral knees; type II diabetes mellitus; neuropathy (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally climb ramps or stairs;

57

never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; limited to frequent handling, fingering and reaching; avoid concentrated exposure to extreme cold, extreme heat, humidity, dust, odors, fumes, pulmonary irritants, unprotected heights, moving mechanical parts and bright light defined as light brighter than standard office lighting; she should not operate heavy equipment or motorized machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 18, 1975 and was 37 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 20, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 40–51.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to include all Plaintiff's functional limitations in the RFC assessment; and

2) the Appeals Council erred in declining to consider or remand the case to the ALJ to consider new evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff argues the ALJ failed to consider her fatigue in assessing her RFC, despite frequent notations of fatigue in her records, her physicians' impressions that she suffered from fatigue, and her reports of fatigue to her medical providers. [ECF No. 13 at 32–34]. She maintains the ALJ's decision provides no analysis as to her asserted fatigue and corresponding limitations and that remand is required in the absence of supporting rationale. [ECF No. 16 at 4–5].

The Commissioner argues Plaintiff has not identified which impairment the ALJ failed to consider or indicated specific physical or mental limitations associated with fatigue. [ECF No. 15 at 9–10]. She maintains fatigue is not a medically-determinable impairment and Plaintiff has not linked her fatigue to a medically-determinable impairment such that it was required to be considered. *Id.* at 10–11. She acknowledges Plaintiff complained of fatigue in 2016, but reported it had improved after she was diagnosed with OSA and started using a CPAP machine. *Id.* at 11. She notes Plaintiff's rheumatologist failed to list fatigue as a concern, despite Plaintiff's report of fatigue. *Id.* She maintains Plaintiff's complaints improved after she initiated treatment with a nutritionist for weight control. *Id.* at 11–12. She

contends Dr. Pierre specified that Plaintiff denied generalized weakness and fatigue. *Id.* at 12.

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In assessing a claimant's RFC, the ALJ is to "consider all of the claimant's 'physical and mental limitations, severe and otherwise, and determine on a function-by-function basis, how they affect [her] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). The RFC assessment should reflect the ALJ's contemplation of all the relevant evidence, and he should address all the claimant's medically-determinable impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate

meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

A claimant's subjective allegations as to the intensity, persistence, and limiting effects of her symptoms are among the evidence the ALJ must consider in assessing her RFC. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the claimant's impairments could reasonably produce the alleged symptoms, he is required to proceed to the second step. *Id.* At the second step, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). He must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6 (2016). His consideration of the claimant's symptoms cannot be "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas*, 983 F.3d at 98 ("We also reiterate the long-standing law in our circuit that

disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In addition to medical evidence, ALJs are to consider other evidence as to the intensity, persistence, and limiting effects of a claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *5 (2016); 20 C.F.R. §§ 404.1529(c), 416.929(c). "Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations." *Id.* ALJs must consider factors relevant to the claimant's symptoms, including evidence of daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of the claimant's medications; any measures the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). They are required to determine "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Although the Commissioner argues Plaintiff has failed to indicate which impairment caused her alleged fatigue, the record suggests Plaintiff had several impairments and has undergone specific treatment that often produces fatigue. According to the Centers for Disease Control and Prevention ("CDC"), fatigue is one of the signs or symptoms of RA. *Rheumatoid Arthritis (RA)*, CDC, https://www.cdc.gov/arthritis/basics/ rheumatoid-arthritis.html (last visited Sept. 27, 2021).[6] The CDC also identifies fatigue or "feel[ing] very tired" as a symptom of diabetes. *Diabetes Symptoms*, CDC, https://www.cdc.gov/diabetes/basics/symptoms.html (last visited Sept. 27, 2021). "Generally feeling tired or weak" is among symptoms of heart failure, as well. *Heart Failure*, CDC, https://www.cdc.gov/ heartdisease/heart_failure.htm (last visited Sept. 27, 2021). According to the National Cancer Institute, fatigue is also a common side effect of cancer treatment. *Side Effects of Cancer Treatment*, National Cancer Institute, https://www.cancer.gov/about-cancer/treatment/side-effects (last visited Sept. 27, 2021).

Plaintiff presented evidence that arguably suggests her fatigue would prevent her from remaining on task as required to complete an eight-hour

---

[6] A court may take judicial notice of factual information located in postings on government websites. *See Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating a court may "take judicial notice of matters of public record").

workday and 40-hour workweek. She alleged fatigue to her providers during multiple treatment visits throughout the relevant period. Tr. at 808, 813, 816, 1022, 1095, 1111, 1220, 1229, 1880, 2034, 2048, 2149, 2168, 2171, 2371. Prior to Plaintiff's alleged onset date, Dr. Graham assessed fatigue, possible due to sleep apnea. Tr. at 188. Dr. Muslimani assessed extreme weakness and fatigue during a visit on July 25, 2018. Tr. at 1221. Dr. Pierre confirmed that Plaintiff experienced fatigue on October 19, 2019. Tr. at 2202. During the first hearing, Plaintiff testified she was disabled due to severe pain and fatigue. Tr. at 105. She stated she had difficulty with memory and focus; she did not want to get out of bed; she did not feel like doing anything on three or four days a week; and she felt tired all day and when performing minimal activities like combing her hair, walking to the car, and attending doctors' appointments. Tr. at 105, 110. She noted her fatigue caused her to sometimes fall asleep while driving or having a conversation and testified during both hearings that she napped during the day. Tr. at 68, 111.

The ALJ found Plaintiff's severe impairments included RA, congestive heart failure, and diabetes mellitus. Tr. at 40. He assessed "status post bilateral mastectomy" as a severe impairment and noted it was "secondary to breast cancer." *Id.* Having found Plaintiff had impairments that could reasonably produce the alleged symptom of fatigue, the ALJ was required to evaluate her allegations of fatigue in relation to the other evidence and the

extent, if any, to which it affected her ability to perform basic work activities in assessing the RFC. *See* 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ did not address allegations of fatigue in evaluating Plaintiff's RFC. In fact, he only mentioned "fatigue" in evaluating Listing 14.09. *See* Tr. at 42 ("Finally, the claimant has not had repeated manifestations of inflammatory arthritis with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) in conjunction with marked limitations in activities of daily living, social functioning, or concentration, persistence or pace."). The ALJ failed to acknowledge Plaintiff's complaints of fatigue in summarizing her subjective allegations. Tr. at 44. He wrote:

> The claimant testified she is unable to work due to joint pain throughout her body. The claimant has balance issues and has trouble concentrating due to pain. She lives with her sister who monitors the claimant's medication. The claimant has back pain that radiates to her upper and lower extremities with numbness and tingling. She does not drive unless she has to due to blurred vision and drowsiness. Her daughters help her with bathing and washing her hair. The claimant has trouble sleeping. She has right upper extremity pain despite surgery. The claimant has uncontrolled high blood pressure as well as congestive heart failure. She is also status post bilateral mastectomy and had to have chemotherapy. The claimant has shortness of breath with exertion due to asthma. She also reports pain in her right upper extremity.

*Id.*

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* He cited "evidence that the claimant has not been entirely compliant in following prescribed treatment," including Plaintiff's refusal to follow through with bilateral knee and wrist injections, her noncompliance with diet, and her reports that she did not exercise. *Id.* He stated the various forms of routine treatment Plaintiff received "ha[d] been generally successful in controlling [her] symptoms." *Id.* He cited findings on exam, medical imaging, and some of Plaintiff's reports to her medical providers. Tr. at 44–47. The ALJ found Dr. Pierre's opinion unpersuasive without acknowledging her affirmation that Plaintiff experienced fatigue. Tr. at 48.

Although the ALJ referenced and provided reasons for rejecting Plaintiff's general statements as to the intensity, persistence, and limiting effects of her symptoms, he did not specifically acknowledge or reject her allegations of fatigue. The Commissioner correctly notes that the record contains conflicting evidence as to fatigue, with Plaintiff reporting fatigue during some treatment visits and denying it during others. However, instead of acknowledging and explaining his resolution of this conflicting evidence, as required pursuant to the applicable regulations, the ALJ merely ignored it. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-8p, 1996 WL 374184, at *7. The

court cannot accept the Commissioner's explanation as a substitute for the ALJ's failure to meaningfully discuss the issue. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83 (4th Cir. 2020) ("The Commissioner seeks to frame the ALJ's statement as an attempt to resolve the alleged inconsistency between Dr. Harper's assertion that the MRI showed evidence of chronic muscle spasm and the fact that the radiologist who read the MRI did not note such evidence. We reject this argument as a meritless post-hoc justification.") (citing *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (rejecting the Commissioner's attempt to justify the ALJ's denial of disability benefits as a post-hoc rationalization); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ("[C]ourts may not accept appellate council's post hoc rationalizations for agency action.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (applying *Burlington Truck* in a Social Security disability case)). The court's review is frustrated by the ALJ's failure to address Plaintiff's allegations as to the limiting effects of fatigue which, if accepted as true, would support a finding that she could not remain on task to meet the demands of competitive work. Therefore, it is necessary for the court to remand the case for the ALJ to consider Plaintiff's allegations of fatigue in assessing her RFC. *See Mascio*, 780 F.3d at 636.

2.    Evidence Submitted to Appeals Council

Plaintiff argues the case should have been remanded because the evidence she submitted to the Appeals Council could have affected the ALJ's decision. [ECF No. 13 at 35]. She submitted a report from EMG and NCV testing performed at Carolina Neuropathy Center on June 5, 2020, which showed moderate sensory and motor polyneuropathy of the nerves of her bilateral feet that was axonal in nature. Tr. at 14–19.

Given the recommended finding that the ALJ erred in failing to consider allegations of fatigue in assessing Plaintiff's RFC, the ALJ will have the opportunity to review on remand the evidence submitted to the Appeals Council. Therefore, the undersigned declines to address Plaintiff's second allegation of error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. §

405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 28, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).